UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------X

INGRIT ECHEVARRIA,

                           Plaintiff,

                  v.

INSIGHT MEDICAL, P.C., AL OKHRAVI,
and DR. STEVE OKHRAVI, individually,

                        Defendants.

----------------------------------------------------X

| |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: <u>December 22, 2014</u> |

13 Civ. 3710 (KPF)

<u>OPINION AND ORDER</u>

KATHERINE POLK FAILLA, District Judge:

       Plaintiff Ingrid Echevarria brought this action in May 2013, accusing her former employer, as well as its owner and manager, of subjecting her to sexual harassment at her workplace and terminating her employment when she complained about the harassment. On June 30, 2014, after a four-day trial, the jury found that Plaintiff had proven her retaliation claims under federal and New York City law, and awarded her $50,000 in compensatory damages. Defendants have filed various post-trial motions, including motions for (i) judgment as a matter of law in favor of Defendants; (ii) a new trial; (iii) remittitur of the damages award; and (iv) attorneys' fees and costs in favor of Defendants as "partially prevailing parties" in this litigation. For the reasons set forth in the remainder of this Opinion, Defendants' motions are denied.

## BACKGROUND

### A.    The Pretrial Procedural History

Plaintiff filed her complaint against Insight and Al and Steve Okhravi on May 31, 2013.  (Dkt. #1).  In it, she brought claims for discrimination (in the form of a hostile work environment) and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 301 (the "NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 to 8-131 (the "NYCHRL").

After the completion of discovery and a failed mediation proceeding, Defendants moved for summary judgment.  (Dkt. #26-29).  In their papers, Defendants argued that (i) Insight did not meet the statutory definition of an employer under the NYSHRL and the NYCHRL; (ii) Plaintiff had failed to present a prima facie case of sexual harassment in the form of a hostile work environment; (iii) Plaintiff had failed to demonstrate that Insight and Dr. Steve Okhravi had notice of the harassment; (iv) Plaintiff's retaliation claim failed because she was not an employee at the time she complained of the harassment; and (v) Plaintiff could not prove damages.  The motion was denied after oral argument on April 17, 2014, and trial was scheduled.  Before trial, Plaintiff agreed to proceed on her federal and city, but not her state, claims of discrimination and retaliation.

**B.     The Evidence at Trial**[1]

The parties agreed that Plaintiff was employed as the office manager at Insight Medical ("Insight") from July 2008 through December 2012.  Her relationship with her immediate supervisor, Al Okhravi, as well as the circumstances of the termination of her employment, were the key factual disputes at trial.

### 1.     Plaintiff's Case at Trial

Plaintiff testified that she began working as an office manager at Insight, a primary care facility for adult patients located in the Bronx, in July 2008. (Tr. 53, 70).  For a two-month period earlier in the year, Plaintiff had been employed at Insight as a medical assistant.  (Tr. 52).  Insight was owned by Dr. Steve Okhravi and managed by his brother, Al Okhravi.  (Tr. 57-58). According to Plaintiff, Al Okhravi communicated with her "daily" by phone, email, or text message, and traveled to Insight's offices from his home in Virginia at least once every two weeks.  (*Id.*).  While at Insight, Al Okhravi would have meetings as needed and bring paychecks, forms, and other supplies.  (*Id.*).

According to Plaintiff, her communications with Al Okhravi increased in October 2012.  (Tr. 59).  By this time, the Okhravi brothers had established two

---

[1]     The parties' memoranda of law in connection with Defendants' post-trial motions are referred to using the conventions "Def. Br.," "Pl. Opp.," and "Def. Reply."  "Tr." refers to the trial transcript, and "PX" and "DX" refer to the parties' respective trial exhibits.  For convenience, certain of the texts introduced at trial are referred to using the convention "[Sender] to [Receiver], [date], [time]."  Many of these texts were also read into the trial record.

24-hour urgent care facilities in Manhattan, using the corporate entity Pinnacle Medical PC ("Pinnacle").  (Tr. 59-60, 383).  Plaintiff recalled a meeting that month with the Okhravi brothers at one of Pinnacle's offices, which meeting was called to discuss, among other things, problems with Dr. Okhravi's remote access of electronic medical records; after the meeting, Plaintiff received an "inappropriate" text message from Al Okhravi.  (Tr. 84-85).  According to Plaintiff, Al Okhravi confessed in the text that "he had wanted to tell [her] something for a long time, but he didn't dare."  (Tr. 84).  When Plaintiff pressed him (also by text) for specifics, he replied that "he liked [her] ass."  (Tr. 86). Within the next week, Plaintiff received multiple messages from Al Okhravi propositioning her for sex, including invitations to a weekend assignation at Atlantic City where they could "eat, drink, and … fuck."  (Tr. 86; *see also* Tr. 87 (receiving a text from Al Okhravi suggesting anal sex); Tr. 88 (receiving a text from Al Okhravi inviting Plaintiff to meet him at a hotel near Giants Stadium); Tr. 97-98 (receiving a text from Al Okhravi suggesting they meet early at Insight's offices for sex)).

According to Plaintiff, separate and apart from the sexual overtures, Al Okhravi also sent her texts about "all his personal things," including medical issues he was experiencing and problems he was having in his marriage. (Tr. 87; *see also* Tr. 90-92 (recounting meeting with Al Okhravi where he conveyed concern about another woman contacting his wife at their home)). Plaintiff did not respond to the majority of the text messages, and made up

4

excuses to decline his invitations.  (Tr. 87-88, 268).  The messages persisted through the beginning of December.  (Tr. 89).[2]

Other issues came to the fore in December 2012.  Insight's physician's assistant, Ricardo Fisher, had lost his insurance coverage, which meant that he could not see patients (and, as a practical matter, that Insight's offices would be closed to patients on those days when a backup physician's assistant could not be found).  (Tr. 100-04).  In addition, medical assistant Erica Gonzalez planned to stop working at Insight shortly and begin her maternity leave.  (Tr. 104-05).

Plaintiff recalled an argument with Al Okhravi on the night of December 18, 2012, concerning the possible replacement of Gonzalez and the staffing of the office over the holidays.  (Tr. 105-08; *see also* Tr. 250-53).  During the argument, Al Okhravi implored Plaintiff to "let him run his office (Tr. 105), and even told her not to come back to work if she disagreed with his decisions (Tr. 109; *see also* Tr. 108 (discussing text from Plaintiff's Exhibit 2 in which Plaintiff tells Al Okhravi, "According to what you said to me, you are telling me not to go back to work.")).  He also advised Plaintiff that he was "frustrated,"

---

[2]     At trial, Plaintiff testified that she deleted the sexually offensive and unduly personal texts from Al Okhravi because of concerns that her children, who had access to her phone, would read them.  (Tr. 96-97, 264-65).  As a sanction for previous discovery violations, the Court instructed the jury during the trial that Defendants had stated that relevant text messages existed, that Plaintiff had requested their production, and that Defendants had failed to produce them.  (Tr. 206).  Accordingly, none of the offensive texts was introduced at trial.

5

and that he sought sex with her to "relieve his frustration." (Tr. 108, *see also* Tr. 253, 299-300).

On the morning of December 19, 2012, Plaintiff sent Al Okhravi a text message indicating that she would not "tolerate anyone mistreating [her]"; she testified that her text pertained to the sexually explicit messages he had been sending. (Tr. 166; *see also* Tr. 168 (discussing text message from Plaintiff in which she advised Al Okhravi that "[a]fter what happened last night, I feel very, very uncomfortable," and that Okhravi "made [her] feel like a piece of [shit]")). Plaintiff advised Al Okhravi that she was rethinking her continued employment with Insight. (Tr. 167). Indeed, Plaintiff fabricated a competing job offer, explaining to the jury that after the preceding evening's conversation, she had realized that "[her] job was not secure there." (Tr. 169-71). However, Plaintiff testified, she never advised Dr. Steve or Al Okhravi that she was going to leave, only that she had been offered another position. (Tr. 173).

While initially protesting that "[n]othing happened last night" (A. Okhravi to Echevarria, 12/19/2012, 7:29 a.m.; *see also* Tr. 169), Al Okhravi later stated that Plaintiff was "a lady and not garbage," and apologized for making her feel like the latter (A. Okhravi to Echevarria, 12/19/2012, 7:30 a.m.). In specific response to Plaintiff's hints about a job offer, Al Okhravi stated, "I do not want to lose u. I hope u consider staying. U r part of family. We will adjust your salary." (A. Okhravi to Echevarria, 12/19/2012, 7:39 a.m.). At the conclusion of their exchange of texts, Al Okhravi asked Plaintiff to "reconsider"

and told her that she had "a secure job."  (A. Okhravi to Echevarria, 12/19/2012, 7:49, 7:51 a.m.).

Later that day, Plaintiff participated in a meeting with Al Okhravi at Insight's offices.  In the course of a conversation in an examination room, in which he sought to convince Plaintiff to remain in her position, Al Okhravi put his hand on Plaintiff's thigh and expressed, again, his desire to have sex with her.  (Tr. 176, 259-60).  Plaintiff left the examination room and returned to the common area of the offices; Okhravi left.  She testified that after that meeting, she intended to remain at Insight, but wanted the harassing conduct to cease. (Tr. 177).

On the evening of December 20, 2012, Plaintiff sent a text to Al Okhravi in which she stated, in relevant part, that "[t]his is not the time for [her] to leave" Insight.  (Tr. 178; *see also id.* ("I would never leave at a time like this. ... Trust me, I would not leave you at a time like this.")).  The following day, Al Okhravi came to Insight's offices with a new physician's assistant, without greeting Plaintiff or introducing her to the new hire.  (Tr. 179).  Plaintiff was put off by Okhravi's brusqueness towards her, and texted these sentiments to him and to Stefanie Messina; she also repeated to Messina the lie about the competing job offer.  (Tr. 186).[3]

---

[3]     Plaintiff recalled a telephone conversation with Messina later that evening, in which she thanked Messina for letting her vent.  (Tr. 186-88).  As discussed *infra*, the parties disputed whether Plaintiff resigned in that conversation.

On December 21, 2012, Plaintiff left a message with Dr. Steve Okhravi to discuss staffing of Insight's offices for the holidays and other issues.  (Tr. 195; *see also* Echevarria to S. Okhravi, 12/21/2012, 7:27 a.m.).[4]  Plaintiff also decided to disclose to Dr. Okhravi the harassment to which his brother had subjected her.  (*See* Tr. 304-05 (noting her prior discomfort with raising to Dr. Okhravi issues with his brother's behavior)).  Ultimately, Plaintiff had a phone conversation with Dr. Okhravi on December 22, 2012, but an odd reference by him to the Pope caused Plaintiff to cut the conversation short after a brief discussion of the tension between Al Okhravi and Plaintiff at Insight's offices on December 19.  (Tr. 196-97).

The next day, Plaintiff received a voice mail in which Dr. Okhravi, among other things, called her "delusional."  (Tr. 198).  Plaintiff then texted him explaining that the reason for her stilted behavior during her meeting with Al Okhravi on December 19 was "because he had proposed many times to [her] that [they] have a sexual relationship."  (Tr. 199, 279; *see also* Echevarria to S. Okhravi, 12/22/2012, 10:16 a.m.).  After exchanging a few more texts, Dr. Okhravi suggested a meeting with Plaintiff to take place the following week, and Plaintiff agreed.  (Tr. 202; *see also* S. Okhravi to Echevarria, 12/22/2012, 10:39 a.m.).  Within 30 minutes, however, Plaintiff received a call from Stefanie

---

[4]     On cross-examination, Plaintiff was questioned about an incident where the replacement physician's assistant had related to her a conversation with Al Okhravi in which he had advised the assistant that Plaintiff "[was not] going to be there with them for very long."  Plaintiff recalled the incident and explained that this, too, was a reason for her reaching out to Dr. Okhravi on Saturday morning, December 22, 2012. (Tr. 274-75).

Messina, advising her that her employment had been terminated, effective immediately; during the course of the call, Dr. Okhravi took the phone from Messina and reiterated what Messina had said.  (Tr. 202-04, 283-84).

Plaintiff testified that during and as a result of her fall 2012 interactions with Al Okhravi, she was "very stressed."  (Tr. 93).  She also noted that she felt "[d]isgusted, disrespected, [and] degraded" after the December 19 meeting at Insight's offices.  (Tr. 176; *see also* Tr. 87, 218).  However, on cross-examination, Plaintiff acknowledged that "[t]here was never a time [she] couldn't perform [her] duties because of sexual harassment."  (Tr. 269; *see also* Tr. 301-02 (noting that her office work environment, apart from her dealings with Al Okhravi, was not abusive)).

At trial, Plaintiff recalled that she was unemployed for a period of approximately two months after her termination from Insight.  (Tr. 209). Plaintiff noted that she became "severely depressed," and had both panic attacks and a loss of appetite.  (Tr. 213).  From December 2012 forward, Plaintiff has also experienced nightmares and flashbacks, including episodes in which she believed she was followed.  (Tr. 217-18).  A social worker who began meeting with Plaintiff in June 2013, Jensy Linares, testified that Plaintiff presented to her as "nervous, anxious, unable to concentrate, unable to sleep … not able to really function during the day with her daily activities." (Tr. 134).  Plaintiff was subsequently diagnosed with post-traumatic stress disorder and major depressive disorder.  (Tr. 137).

### 2.    Defendants' Case at Trial

Unsurprisingly, Defendants' witnesses testified to different recollections of events and different interpretations of their communications with Plaintiff. Stefanie Messina, Pinnacle's office manager, recalled a conversation with Plaintiff on December 18, 2012, during which Plaintiff recounted a fight that had transpired earlier in the day between herself and Al Okhravi and told Messina that she (Plaintiff) had resigned.  (Tr. 325-26).  Indeed, Messina testified that Plaintiff had asked her (Messina) to tell Dr. Okhravi that she had quit.  (Tr. 326-27; *see also* Tr. 330 ("she had already made that decision, so she felt that it should stick")).[5]  Messina advised Dr. Okhravi of Plaintiff's resignation the following day, December 19.  (Tr. 331).  Dr. Okhravi asked Messina to reach out to Gina Whyte, an employee at an MRI facility to which Pinnacle had referred its patients, and solicit her interest in the position. (Tr. 331-32).  Whyte met that day with both Okhravi brothers and Messina, and later in the day accepted the position of Insight's office manager.  (Tr. 332-33; *see also* DX E (offer letter prepared by Messina dated December 19, 2012)).

---

[5]    Messina acknowledged on cross-examination that Plaintiff continued to come to work at Insight for several days following their December 18 telephone conversation.  Messina suggested that "maybe [Plaintiff] was considering her two weeks' notice."  (Tr. 338; *see also id.* ("Initially, she had told me she resigned.  And then she was still there, so I thought she was doing like a two-week notice.")).  Messina was aware that Al Okhravi had asked Plaintiff to remain at Insight, and reviewed during her cross-examination a text from Plaintiff indicating, even after December 19, that she (Plaintiff) had decisions to make regarding her employment.

Messina's testimony about subsequent events is somewhat muddled.  First, Messina testified that, by December 20, she believed that Plaintiff intended to continue working at Insight, and that Plaintiff intended to take Al Okhravi up on his offer that she reconsider.  (Tr. 344).  However, she later testified as to her belief that Plaintiff "was going to leave because of her conversations with Al Okhravi."  (Tr. 346).

Gina Whyte testified similarly that she received a phone call from Stefanie Messina on December 19, 2012, discussing a job opportunity that had arisen because "somebody was leaving."  (Tr. 373-74; *see also* Tr. 378-79 (recalling on cross-examination that the process of hiring her had been expedited because "the person was leaving, and I know they needed somebody there to help")).  Whyte went to Pinnacle's 42nd Street office later that day; met with Messina and the Okhravi brothers; and accepted the job offer "that same night," with the understanding that she would start on January 3, 2013. (Tr. 375-76, 378).

Dr. Steve Okhravi testified that Stefanie Messina showed him a December 18, 2012 text from Plaintiff in which she resigned from Insight, though the actual text was not produced in discovery or introduced as an exhibit at trial.  (Tr. 389, 456-57; *see also* Tr. 434 (mentioning Messina conversation in voice mail to Plaintiff)).  He also recalled learning on December 19, 2012, from Al Okhravi that Al's efforts to convince Plaintiff to remain at Insight had failed.  (Tr. 391-92, 471-72).[6]  Consequently, Dr. Okhravi instructed Stefanie Messina to contact Gina Whyte about the position. (Tr. 393-94).  He participated in Whyte's interview later that day, and ultimately offered her Plaintiff's position as office manager at Insight.  (Tr. 394-96).

---

[6]     Dr. Okhravi understood, however, that Plaintiff continued to come to work after December 18.  (Tr. 426).

11

For the first time on December 22, 2012, Plaintiff advised Dr. Okhravi that his brother had sent her inappropriate text messages.  (Tr. 428, 430).  He responded by asking her for the texts, which he never received.  (Tr. 431-32). Dr. Okhravi scheduled a meeting with Plaintiff to discuss her concerns, but the meeting did not take place because of what Dr. Okhravi termed "a series of events."  (Tr. 435; *see also id.* ("[Plaintiff] resigned, and there was no relationship, and it never happened."); Tr. 480-84 (acknowledging that he had scheduled a meeting to discuss Plaintiff's allegations of harassment, but then canceled the meeting because Plaintiff had not immediately sent him the text messages)).  Instead, Dr. Okhravi instructed Messina to call Plaintiff "and tell her she does not need to come in to fulfill her remaining two weeks."  (Tr. 436).

At trial, Dr. Okhravi repeatedly testified to his understanding — even while reviewing several equivocal emails from Plaintiff — that Plaintiff had quit on December 18, and that any time that she had worked at Insight after that date was in fulfillment of her obligation to give two weeks' notice.  (*See, e.g.*, Tr. 466, 474-75).  Dr. Okhravi also maintained that Plaintiff's employment terminated on December 18, even as he conceded that his brother had spoken at length with Plaintiff on December 19 to convince her to remain with the company.  (Tr. 486-87).

The final witness at trial was Defendant Al Okhravi.  Okhravi handled the "big things" at Insight, e.g., accounts payable, payroll, finance, accounting, and information technology.  (Tr. 511).  He traveled from Virginia to New York

12

biweekly, and later weekly, to perform tasks for Insight and Pinnacle. (Tr. 512-13). He echoed testimony from Plaintiff and from Dr. Okhravi concerning Plaintiff's earlier, two-month stint working at Insight in early 2008; of significance, Al Okhravi testified that when Plaintiff resigned from Insight in 2008, she gave two weeks' notice. (Tr. 517).

Al Okhravi had a different recollection from Plaintiff of his December 18 conversation/argument with her. According to him, the two discussed staffing (including the above-described problems occasioned by the lapse in insurance coverage for the physician's assistant), and argued over his decision to keep Insight's offices open on Christmas Eve. (Tr. 535-38). According to Okhravi, Plaintiff quit in the course of that conversation, which he considered to be an overreaction to their dispute and which prompted him to send several texts asking her to stay with Insight. (Tr. 538, 540-45, 549).

At trial, Okhravi interpreted a text from Plaintiff that post-dated the meeting, in which Plaintiff mentioned "a choice" that she would have to make concerning her future employment, as a resignation. (Tr. 546). He testified that he exchanged additional texts with Plaintiff, trying to calm her down and reconsider, which culminated in a face-to-face meeting at Insight's offices on December 19. (Tr. 548-52). Okhravi testified that Plaintiff's texts suggested that "would not change her mind, basically," about leaving. (Tr. 552-53). Okhravi testified that at the December 19 meeting, he offered to increase Plaintiff's salary, and pressed her for an immediate decision, to which she

replied "I am leaving."  (Tr. 554-55; *see also* Tr. 557-58 (surmising that text sent later that day by Plaintiff checking in on him was because she was concerned about his reaction to her resignation)).  After the meeting, Okhravi advised his brother that Plaintiff was "not staying," and commenced the search for a replacement, resulting in an offer being made to Gina Whyte later that day.  (Tr. 555-57).

Al Okhravi testified that while he was aware that Plaintiff had come to work after December 19, he believed that it was part of the two weeks' notice she had given.  (Tr. 559).  However, Okhravi was confronted with texts he had sent to Plaintiff after her purported resignation about remaining with Insight, including a text on the evening of December 19 in which he indicated to her that she had a "secure job."  (Tr. 603).  Okhravi was also presented at trial with his deposition testimony, where he had testified that Plaintiff sought a few days after December 19 to make a final decision concerning her job; he explained at trial that her request had been rejected because he needed an "immediate answer."  (Tr. 608-10).  According to Okhravi, by the time he received Plaintiff's text that she would not "leave [Insight] at a time like this," he and his brother had already hired her replacement.  (Echevarria to A. Okhravi, 12/20/2012, 6:44 p.m.).

## C.   **Defendants' Mid-Trial Motions and the Verdict**

At the close of Plaintiff's case, Defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  (Tr. 305-19).  Among

other things, Defendants argued that (i) Plaintiff had failed to prove her aiding

and abetting claim under the NYCHRL against Dr. Steve Okhravi or Al Okhravi,

although for different reasons as to each; (ii) Plaintiff had failed to present

evidence of unwelcome conduct that was sufficiently severe or pervasive that it

altered the conditions of employment; and (iii) Plaintiff had failed to prove that

Insight employed 15 or more persons.  The Court reserved decision on the

motions.

On June 30, 2014, the jury returned a verdict finding that Plaintiff had

not proven her discrimination claims, but had proven her retaliation claims,

under Title VII (as to Insight) and the NYCHRL (as to Insight, Dr. Steve

Okhravi, and Al Okhravi).  (Dkt. #54).  It awarded her $50,000 in compensatory

damages against Insight Medical only, and nothing in punitive damages.

## D.   Defendants' Post-Trial Motions

On August 21, 2014, Defendants filed a motion for judgment as a matter

of law and, in the alternative, for a new trial or remittitur of the damages

award, as well as a motion for attorneys' fees.  (Dkt. #65, 67).  In the former,

Defendants argued that (i) Insight did not qualify as an employer under Title

VII or the NYCHRL; (ii) Plaintiff had failed to demonstrate that she engaged in a

protected activity, as required to support a finding of unlawful retaliation, or

that she was an employee at the time of the alleged retaliatory conduct;

(iii) Plaintiff had failed to present evidence of retaliation, inasmuch as she had

failed to rebut Defendants' non-retaliatory reason for her termination and failed

to demonstrate a causal connection between the proffered protected activity
and her termination; (iv) the jury's verdict was excessive; and (v) a new trial
was warranted.  (Dkt. #66).[7]

In reviewing Defendants' post-trial motions, the Court determined that
the issue of whether Insight had a sufficient number of employees to be subject
to the NYCHRL and Title VII was not, as the parties had believed, a
jurisdictional issue for the Court's determination, but rather was an element of
each offense that should have been presented to the jury.  *See Arbaugh* v.
*Y & H Corp.*, 546 U.S. 500, 516 (2006) ("the threshold number of employees for
application of Title VII is an element of a plaintiff's claim for relief, not a
jurisdictional issue").  By Order dated October 6, 2014, the Court requested
supplemental briefing from the parties on whether this employee-numerosity
issue had been waived or forfeited by the parties by their failures to request a
jury charge in this regard; whether the parties wished now to have the Court
decide the issue; and whether a new trial was warranted.  (Dkt. #80).  A
conference with the parties to discuss these issues was then held on November
20, 2014.  Ultimately, the parties waived their right to have the jury decide the

---

[7]     Defendants timely filed a notice of motion for attorneys' fees and costs as a "partially
prevailing" parties, but failed to file a memorandum in support of that motion until
several weeks later.  By Order dated September 3, 2014, the Court rejected the
untimely supporting memorandum.  (Dkt. #73).  As a practical matter, this rejection
has little effect; Plaintiff filed a memorandum in opposition to the motion to which
Defendants replied, ensuring that their arguments were before the Court.  (Dkt. #77,
79).

issue, and agreed instead to have the issue decided by the Court.  (Dkt. #81, 86).

## DISCUSSION

**A.    Defendants' Are Not Entitled to Judgment as a Matter of Law**

### 1.    Applicable Law

Rule 50 "imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Cash* v. *County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)(1)); *accord Bucalo* v. *Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127-28 (2d Cir. 2012).  The "burden is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Cash*, 654 F.3d at 333 (internal quotation marks omitted).  In such circumstances, a court may set aside the verdict only if, viewing the evidence in the light most favorable to the non-movant, "there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Id.* (internal quotation marks omitted); *accord Stampf* v. *Long Island R. Co.*, 761 F.3d 192, 197-98 (2d Cir. 2014); *see also, e.g.*, *Zellner* v. *Summerlin*, 494 F.3d 344, 371 (2d Cir.

17

2007) (stating that a Rule 50 motion may be granted only if the court
concludes that "a reasonable juror would have been compelled to accept the
view of the moving party" (internal quotation marks omitted)).

In deciding a motion under Rule 50, the Court must disregard any
evidence that weighs against the jury's verdict unless the jury was required to
believe it. *Zellner*, 494 F.3d at 370 (citing *Reeves* v. *Sanderson Plumbing*, 530
U.S. 133, 150-51 (2000)). The jury is required to believe the testimony of
unimpeached, disinterested, uncontradicted, and plausibly credible witnesses.
*See, e.g.*, *Reeves*, 530 U.S. at 151. The question is whether, if credibility
assessments are made against the moving party and all reasonable inferences
are drawn against the moving party, a reasonable jury nevertheless would have
no choice but to find in the movant's favor. *Zellner*, 494 F.3d at 370-71 (citing
*Piesco* v. *Koch*, 12 F.3d 332, 343 (2d Cir. 1993)).

### 2. Several of Defendants' Claims Are Not Properly Raised Under Fed. R. Civ. P. 50(b)

As a preliminary matter, both parties are correct that Defendants are
"limited to those grounds that were specifically raised" in Defendants' motion
pursuant to Fed. R. Civ. P. 50(a). (*Compare* Def. Br. 3 (internal quotation
marks and citation omitted), *with* Pl. Opp. 4). More pointedly, however,
Plaintiff is correct that several of the claims advanced in Defendants' current
new trial motion were not raised in their Rule 50(a) motion. (Pl. Opp. 4). In
particular, Defendants failed to raise before submission of the case to the
jury — and thus cannot raise now — their arguments that (i) Plaintiff failed to

demonstrate that Insight was a qualifying employer (based on the number of persons employed) under the NYCHRL; (ii) Plaintiff was not an employee at the time of the alleged retaliatory conduct (i.e., because she had resigned on December 18); and (iii) Plaintiff failed to prove her claims of retaliation because she failed to rebut the non-discriminatory reason proffered by Defendants' for her termination (i.e., that she had been terminated from Insight because the company had already hired Gina Whyte to replace her upon learning of her resignation).[8]

In response, Defendants contend that the issue of Plaintiff's employee status *vel non* was raised "[t]hroughout trial and during several sidebars," and further note that "the Court went to great lengths to understand the arguments and it was clear Defendants put forth two arguments," including an argument that Defendants had a non-retaliatory reason for terminating her employment. (Def. Reply 1). While Defendants correctly cite the trial record, they misperceive the legal significance of these facts. It is plainly not the case that every argument advanced during trial can be renewed in a Rule 50(b) motion. Rather, as the Second Circuit has confirmed:

> Under Rule 50(a), a motion for judgment as a matter of law must first be made before the case is submitted to the jury, and renewed following the verdict pursuant to Rule 50(b). The law is pellucid that a party's failure to move under Rule 50(a) has consequences. If that party later moves under Rule 50(b), the standard for granting judgment as a matter of law is elevated, and the motion may not properly be granted by the district court, or

---

[8]   As it happens, Defendants' unpreserved claims also fail on the merits, as discussed *infra.*

19

> upheld on appeal, except to prevent manifest injustice.
> Manifest injustice exists where a jury's verdict is wholly
> without legal support.

*ING Global* v. *United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir.

2014) (internal citations omitted); *Lore* v. *City of Syracuse*, 670 F.3d 127, 153

(2d Cir. 2012) ("As to any issue on which proper Rule 50 motions were not

made, JMOL may not properly be granted by the district court, or upheld on

appeal, or ordered by the appellate court unless that action is required in order

to prevent manifest injustice." (citations omitted)).  Defendants have not, and

cannot, demonstrate manifest injustice on this record.  The parties' arguments

with regard to the evidence arguments were made — fully and repeatedly — to

the jury.  Each side could point to evidence in the trial record to support its

arguments; the jury's verdict was therefore not against the weight of the

evidence, and certainly did not constitute a manifest injustice.

### 3. Insight Qualified as an Employer Under the NYCHRL and Title VII

Defendants' principal argument in favor of judgment as a matter of law is

that Insight lacked a sufficient number of employees to implicate either the

NYCHRL or Title VII.  The parties agreed after trial that the Court, and not the

jury, could decide this issue.  For the reasons set forth below, Plaintiff satisfied

the employee-numerosity thresholds of both the NYCHRL and Title VII.

### a. The Evidence at Trial

At trial, Plaintiff acknowledged that she was employed from 2008 to 2012

by Insight, and not by Pinnacle.  (Tr. 221).  Plaintiff recalled that there were

20

two physician's assistants, two medical assistants, one scanner, and herself working at Insight, as well as Dr. Steve Okhravi.  (Tr. 53, 226; *see also* Tr. 532-33 (testimony of Al Okhravi that Insight typically employed a physician's assistant, two medical assistants, one office manager, and occasionally one scanner).  Plaintiff further recalled that at least three people were present at each Pinnacle office during the 24 hours of its operation, and believed that, aggregating personnel at both Pinnacle and Insight, the Okhravis employed "more than 15" people.  (Tr. 59-60).

Plaintiff also presented evidence suggesting joint or integrated operation of Insight and Pinnacle.  For instance, Plaintiff testified that she assisted the staff at Pinnacle's Chambers Street office in setting up that office, and that she worked for one day at Pinnacle's 42nd Street office.  (Tr. 61).  She also worked closely with the office manager of the two Pinnacle offices, Stefanie Messina. (Tr. 77-78; *see also* Tr. 81-82 (discussing frequency of interactions with Pinnacle personnel)).  She would send supplies, including vaccines, from Insight to Pinnacle, and would receive supplies, including suture kits, from Pinnacle.  (Tr. 61-62).  Plaintiff understood that both companies used the same supply company, and that Al Okhravi would sometimes order supplies for both entities at once.  (Tr. 62, 225; *see also* PX 4 (emails in which Insight is referred to as "the Bronx" or "the Bronx Office" to distinguish it from Pinnacle's two offices)).

Plaintiff was given both an Insight and a Pinnacle email address.  (PX 4; Tr. 71-73; *see also* Tr. 442 (testimony of Dr. Steve Okhravi that certain employees, "on a discretionary basis," were given email addresses at both companies)).  She recalled that she could access electronic medical records for Insight patients at Pinnacle's offices, though the passwords for the Insight and Pinnacle systems differed.  (Tr. 83).

On the issue of sharing employees, Plaintiff recalled that Insight's physician's assistant, Ricardo Fisher, would sometimes work at Pinnacle's offices, and that several of Pinnacle's physician's assistants, including Chinwe Nduka, would cover for Fisher in situations in which Insight could not otherwise secure coverage.  (Tr. 63; *but see* Tr. 450 (testimony of Dr. Okhravi that Nduka "never worked at Pinnacle")).  She also recalled that certain administrative personnel, including Erica Gonzalez, worked at both entities. (Tr. 63).  Plaintiff assisted in providing coverage to Pinnacle, but did not "manage[] the staff" there.  (Tr. 224).

According to Plaintiff, Insight employees who worked at Pinnacle were not separately compensated by Pinnacle.  (Tr. 64 (testifying that she knew the employees were paid by Insight "[b]ecause I was the one that gave the checks to the employees")).  Plaintiff never received additional compensation for the work that she performed at either Pinnacle office.  (Tr. 61).

Finally, Plaintiff recalled that Al Okhravi's management duties extended to, and were exercised at the same time across, all three medical offices.  (*See,*

22

*e.g.*, Tr. 78-80; *see also* Tr. 511, 519-20 (testimony of Al Okhravi that he handled finance, payroll, information technology, accounts payable, and supplies for both Insight and Pinnacle)).

Defendants' witnesses sought to highlight the differences — legal and practical — between the Insight and Pinnacle entities.  Dr. Steve Okhravi pointed out in his direct testimony that Insight and Pinnacle were two different corporate entities, offering different types of medical services.  (Tr. 382-84).  He recalled that Insight had four employees, while Pinnacle had more, and that employees were paid by the particular entity at which they worked.  (Tr. 384).  The two companies had separate e-mail systems, and while they used the same company to maintain their electronic medical records, they used separate account numbers for each company.  (Tr. 385; *see also* Tr. 524-25 (testimony of Al Okhravi)).

On cross-examination, Dr. Okhravi conceded that medical assistants were transferred between companies "on an emergency basis," and that Insight's physician's assistant performed work for Pinnacle "when they are not working at Insight."  (Tr. 445-46).  He recalled, however, that "they were paid based on that location's payroll."  (Tr. 447; *but see* Tr. 449 (discussion of email in which Pinnacle employee was working at Insight, but where request was made to "add this to his Pinnacle time sheet")).  Dr. Okhravi also acknowledged that Stefanie Messina performed tasks for both entities, but explained that she was his "right-hand person," and that at times he "delegate[d] responsibilities

for both Pinnacle and Insight" to her.  (Tr. 452).  Later in his cross-examination, Dr. Okhravi conceded that, when and as needed, he "move[d] resources from one entity to the other."  (Tr. 453).

Al Okhravi testified that he performed similar duties for Pinnacle and Insight, and worked for both companies "on a regular basis."  (Tr. 574).  He received a share of the profits from Insight, and a straight salary from Pinnacle.  (Tr. 574-75).  When possible, Okhravi would perform his duties for both companies at the same time.  (Tr. 576-77 ("If it is — if it is not against the law and illegal, yes.")).

Okhravi recalled that Pinnacle had 10-12 full-time employees, and, including part-time employees, 14-15 employees in 2012.  (Tr. 572-73).  Insight had four full-time employees in that year.  (Tr. 573).  Employees of one company would occasionally be posted to another company if there were problems with staffing; Okhravi testified that these employees would be paid extra, but conceded that they might sometimes receive that additional payment from the company for which they regularly worked (rather than the company to which they had been posted).  (Tr. 578-80).  Okhravi also testified that employees from both companies were invited to Pinnacle's holiday party.  (Tr. 580-81).

> ### b.   Applicable Law

> #### i.   The NYCHRL

The NYCHRL defines, as one of several unlawful discriminatory practices,

> For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or discharge from employment such person or to discriminate against such person in competition or in terms, conditions or privileges of employment.

N.Y.C. Admin. Code § 8-107(1)(a).  As amended by the Local Civil Rights

Restoration Act of 2005, N.Y.C. Local L. No. 85, all provisions of the NYCHRL

> shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title have been so construed.

*Id.* § 8-130; *see also Albunio* v. *City of New York*, 16 N.Y.3d 472, 477-78 (2011)

(requiring that all provisions of the NYCHRL be construed "broadly in favor of

discrimination plaintiffs, to the extent that such a construction is reasonably

possible"); *see generally Mihalik* v. *Credit Agricole Cheuvreux N. Am., Inc.*, 715

F.3d 102, 109-10 (2d Cir. 2013).

The NYCHRL does not so much define what a qualifying employer *is* as

what it is *not*: it excludes from the term's reach "any employer with fewer than

four persons in his or her employ."  N.Y.C. Admin. Code § 8-102(5); *see*

*generally Robins* v. *Max Mara, U.S.A., Inc.*, 923 F. Supp. 460, 470 (S.D.N.Y.

1996); *Krohn* v. *N.Y.C. Police Dep't*, 2 N.Y.3d 329, 334 (2004).  And in contrast

to other anti-discrimination statutes, such as Title VII, the statute speaks not

of employees, but of "persons," defined to include "one or more natural

persons, proprietorships, partnerships, associations, group associations,

organizations, governmental bodies or agencies, corporations, legal
representatives, trustees, trustees in bankruptcy, or receivers."  N.Y.C. Admin.
Code § 8-102(1).

### ii.    Title VII

Title VII imposes liability for employment discrimination only on an
"employer," which is defined by the statute as "a person engaged in an industry
affecting commerce who has fifteen or more employees for each working day in
each of twenty or more calendar weeks in the current or preceding calendar
year, and any agent of such a person."  42 U.S.C. § 2000e(b).  Notably,
however, "[t]he definition of 'employer' has been construed liberally for Title VII
purposes and does not require a direct employer/employee relationship."  *Lima*
v. *Addeco*, 634 F. Supp. 2d 394, 399 (S.D.N.Y. 2009) (citations omitted); *see
also Gulino* v. *N.Y. Educ. Dep't*, 460 F.3d 361, 378-79 (2d Cir. 2006) (holding
that courts should apply "traditional indicators of employment under the
common law of agency" in determining whether an entity is a plaintiff's
employer under Title VII).

For statutes such as Title VII, where Congress uses the term "employee"
without specifically defining it, the Supreme Court has directed courts to
presume that Congress had in mind "'the conventional master-servant
relationship as understood by the common-law agency doctrine.'"  *Nationwide
Mut. Ins. Co.* v. *Darden*, 503 U.S. 318, 322-23 (1992) (*quoting Cmty. for Creative*

*Non-Violence* v. *Reid*, 490 U.S. 730, 739-40 (1989)).[9]  And in *Clackamas*

*Gastroenterology Assocs., P.C.* v. *Wells*, 538 U.S. 440, 448 (2003), the Court

confirmed that "the common-law element of control is the principal guidepost

that should be followed" — in that case, in determining whether a shareholder

of a professional corporation was an "employee" under the anti-discrimination

statutes.  The Court further focused the inquiry to consider "whether the

individual acts independently and participates in managing the organization, or

whether the individual is subject to the organization's control."  *Id.* at 449.[10]

---

[9]     In *Reid*, the Court culled 13 factors from federal case law and the RESTATEMENT (SECOND) OF AGENCY for courts to consider in determining whether a "hired party" is an employee for purposes of the Copyright Act:

> [i] the hiring party's right to control the manner and means by which the product is accomplished ... [;][ii] the skill required; [iii] the source of the instrumentalities and tools; [iv] the location of the work; [v] the duration of the relationship between the parties; [vi] whether the hiring party has the right to assign additional projects to the hired party; [vii] the extent of the hired party's discretion over when and how long to work; [viii] the method of payment; [ix] the hired party's role in hiring and paying assistants; [x] whether the work is part of the regular business of the hiring party; [xi] whether the hiring party is in business; [xii] the provision of employee benefits; and [xiii] the tax treatment of the hired party.

490 U.S. at 751-52 (footnotes omitted)

[10]    The six factors set forth in *Clackamas* to determine whether a shareholder is an employee include: (i) "whether the organization can hire or fire the individual or set the rules and regulations of the individual's work"; (ii) "whether and, if so, to what extent the organization supervises the individual's work"; (iii) "whether the individual reports to someone higher in the organization"; (iv) "whether and, if so, to what extent the individual is able to influence the organization"; (v) "whether the parties intended that the individual be an employee, as expressed in written agreements or contracts"; and (vi) "whether the individual shares in the profits, losses, and liabilities of the organization."  538 U.S. at 450-51 (quoting EEOC Compliance Manual § 605:0009). The Court made clear, however, that "these six factors need not necessarily be treated as 'exhaustive,'" and, further, that "[t]he answer to whether a shareholder-director is an employee or an employer cannot be decided in every case by a 'shorthand formula or magic phrase.'"  *Id.* at 450 n.10 (quotations and citations omitted).

Prior to *Clackamas*, the Second Circuit had articulated a three-factor test that considered "[i] whether the [executive] has undertaken traditional employee duties; [ii] whether the [executive] was regularly employed by a separate entity; and [iii] whether

27

Even part-time workers can qualify as "employees" under Title VII.  *See Walters* v. *Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997) (adopting the "payroll method," by which a court calculates the number of employees who are on the payroll for each day of a given week regardless of whether they were actually present at work each day, to determine whether an employer has reached Title VII's threshold number); *see also Aly* v. *Mohegan Council, Boy Scouts of America*, 711 F.3d 34, 44-45 (1st Cir. 2013).

### iii.    Aggregation of Employees Under the NYCHRL and Title VII

Finally, courts have allowed plaintiffs raising claims under both the NYCHRL and Title VII to aggregate employees of different entities in order to satisfy the numerosity requirement, pursuant to what has come to be known as the "single employer" (or "single integrated employer") and the "joint employer" doctrines.  *See generally Turley* v. *ISG Lackawanna, Inc.*, — F.3d —, No. 13-561, 2014 WL 7172061, at *9 (2d Cir. Dec. 17, 2014) (collecting cases); *Arculeo* v. *On-Site Sales & Marketing, LLC*, 425 F.3d 193, 197-98 (2d Cir. 2005); *Strauss* v. *N.Y. Dep't of Educ.*, 805 N.Y.S.2d 704, 707-08 (3d Dep't 2005).[11]

---

the [executive] reported to someone higher in the hierarchy." *E.E.O.C.* v. *Johnson & Higgins, Inc.*, 91 F.3d 1529, 1539 (2d Cir. 1996); *see also id.* at 1539-40 (holding that directors of an insurance brokerage firm were employees for purposes of the ADEA because each performed traditional employee duties, worked full-time for the firm, and reported to senior members of the firm).  Even after *Clackamas,* the Second Circuit has occasionally employed the *Johnson & Higgins* test.  *See, e.g., Frederick* v. *United Broth. of Carpenters and Joiners of America (UBCJA) Local 926*, 558 F. App'x 83, 85 (2d Cir. 2014) (summary order).

[11]     At least one court has recognized that the Second Circuit in *Gulino* appeared to conflate the two doctrines into a "single or joint employer" test, despite having previously distinguished them in cases like *Arculeo.  Dupree* v. *Urban Homesteading Assistance Bd. Sterling St. Housing Dev. Fund Corp.*, No. 10 Civ. 1894 (JG)(JO), 2011 WL 1343163, at

Under the "single employer" doctrine, liability may be found "when two nominally separate entities are part of a single integrated enterprise." *Lima*, 634 F. Supp. 2d at 399-400 (quoting *Arculeo*, 425 F.3d at 198 (internal quotation marks omitted)); *see also Gulino*, 460 F.3d at 378 (considering the "[i] interrelation of operations, [ii] centralized control of labor relations, [iii] common management, and [iv] common ownership or financial control").

The single employer doctrine allows a plaintiff to hold a party liable where there is "sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer." *Chin-McKenzie* v. *Continuum Health Partners*, 876 F. Supp. 2d 270, 294 (S.D.N.Y. 2012) (internal citations omitted).  The most common example of a "single employer" or "single integrated entity" is a parent and a wholly owned subsidiary.  *Arculeo*, 425 F.3d at 198; *see also Lima*, 634 F. Supp. 2d at 399-400 ("Single integrated enterprises can include parent and wholly-owned subsidiary corporations or separate corporations that operate under common ownership and management.").  The critical question in this analysis is "what entity made the final decision regarding employment matters related to the person claiming

*6 n.9 (E.D.N.Y. Apr. 8, 2011); *cf. Arculeo*, 425 F.3d at 198 ("The labeling can be deceptive because the terms are used in numerous contexts, such as union representation, responsibility for violations of the Fair Labor Standards Act, and, as here, Title VII liability.  Notwithstanding the same label and some core similarities between those contexts, the doctrines might differ significantly in different contexts."). Similar to the *Dupree* Court, this Court distinguishes the two doctrines.

discrimination?" *Velez* v. *Novartis Pharm. Corp.*, 244 F.R.D. 243, 250 (S.D.N.Y. 2007) (citation omitted); *see also id.* ("The four-factor test may be satisfied 'by a showing that there is an amount of participation that is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions.'" (quoting *Cook* v. *Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1241 (2d Cir. 1995))).

"In contrast to the single employer theory, joint employment 'assumes that [there] are separate legal entities, but that [the entities] handle certain aspects of their employer-employee relationship jointly.'" *Dias* v. *Cmty. Action Project, Inc.*, No. 07 Civ. 5163, 2009 WL 595601, at *3 (E.D.N.Y. Mar. 6, 2009) (alterations in original).[12]   Under this doctrine, liability may be found when "separate legal entities have chosen to handle certain aspects of their employer-employee relationships jointly." *Lima*, 634 F. Supp. 2d at 400 (quoting *Gore* v. *RBA Grp., Inc.*, No. 03 Civ. 9442 (KMK), 2008 WL 857530, at *3 (S.D.N.Y. Mar. 31, 2008)).   "Where this doctrine is operative, an employee, formally employed by one entity, who has been assigned to work in circumstances that justify the conclusion that the employee is at the same time constructively employed by another entity, may impose liability for violation of employment law on the constructive employer, on the theory that this other entity is the employee's joint employer." *Arculeo*, 425 F.3d at 198.

---

[12]   For this reason, under the joint employer theory, "only the employees who are jointly employed can be aggregated for Title VII purposes." *Ingenito* v. *Riri USA, Inc.*, No. 11 Civ. 2569 (MKB), 2013 WL 752201, at *5 n.3 (S.D.N.Y. Feb. 27, 2013) (citing *Dias*, 2009 WL 595601, at *3).

The Second Circuit has "not yet fully analyzed or described a test for what constitutes joint employment in the context of Title VII.... The indicia suggesting a conclusion of joint employment may vary depending on the purpose of the inquiry." *Arculeo*, 425 F.3d at 199 n.7 (citing *Zheng* v. *Liberty Apparel Co., Inc.*, 355 F.3d 61, 72 (2d Cir. 2003)).  The *Zheng* case, which arose under the Fair Labor Standards Act, considered

> [i] whether [defendant's] premises and equipment were used for the plaintiffs' work; [ii] whether the Contractor Corporations had a business that could or did shift as a unit from one putative joint employer to another; [iii] the extent to which plaintiffs performed a discrete line-job that was integral to [defendant's] process of production; [iv] whether responsibility under the contracts could pass from one subcontractor to another without material changes; [v] the degree to which the [ ] Defendants or their agents supervised plaintiffs' work; and [vi] whether plaintiffs worked exclusively or predominantly for the [ ] Defendants.

*Zheng*, 355 F.3d at 72.  Other factors suggested have included "commonality of hiring, firing, discipline, pay, insurance, records, and supervision."  *NLRB* v. *Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir. 1994) (per curiam).

### c.   Discussion

Plaintiff testified that during her tenure at Insight, the company employed four persons, separate and apart from Al and Steve Okhravi.  (Tr. 53, 226).  Both Okhravis corroborated Plaintiff's testimony, noting that Insight typically employed four to five persons.  (*See* Tr. 384 (Dr. Steve Okhravi testifying that "Insight Medical is set up [with] two medical assistants, [a] physician's assistant and a lead person, office manager."); Tr. 532-33 (Al

31

Okhravi testifying that Insight Medical employed one office manager, one physician's assistant, two medical assistants, and occasionally a part-time scanner)).

In their motion papers, Defendants advance somewhat contradictory arguments:  While describing Insight in their papers as a "small operation consisting of four full[-]time employees" (Def. Br. 6), Defendants nonetheless claim that Insight was not subject to the NYCHRL because, at the exact moment that Plaintiff stopped working at Insight, the company employed only "one employee — a medical assistant" (*id.*; *see also* Tr. 105, 204-05, 285 (referring to a medical assistant named "Monica")).  Plaintiff responds that the latter figure overlooks a number of temporary and permanent Insight employees, including Plaintiff herself.  (Pl. Opp. 7-8).

As previously discussed, Defendants' current challenge to Insight's status as a qualifying employer under the NYCHRL is procedurally improper. During their mid-trial motions, Defendants challenged Insight's status under Title VII, but not under the NYCHRL.  (Tr. 314 (arguing that "the plaintiff hasn't established that there are 15 or more employe[e]s")).  For completeness, however, the argument and its deficiencies are discussed in this section.

Resolution of the employee-numerosity requirement under either statute begins with identifying those Insight employees whose status is beyond dispute.  They include, first, the medical assistant identified at trial as "Monica."  Second is Plaintiff — who, contrary to Defendants' arguments, was

Insight's office manager and employee during the relevant time period. Third is the medical assistant Erica Gonzalez; while there was testimony at trial about the possibility of firing her in late 2012, Gonzalez testified at trial that she was employed at Insight for a five-year period that ended in May 2014. (Tr. 397).

There are other persons who, in fairness, ought to be deemed Insight employees during the relevant period, but whose status is slightly less clear. The parties agreed at trial that Insight had a fourth employee during the relevant time period, namely, a physician's assistant. Until the end of 2012, that position was held by Ricardo Fisher; shortly before Plaintiff's termination, the position was assumed by Robert Brugna. (Tr. 101). Particularly in light of (i) the expansive reading accorded to the NYCHRL, (ii) the absence of temporal restrictions on the numerosity requirement, and (iii) the preponderance standard under which this issue is decided, Fisher/Brugna should count as the fourth person under the NYCHRL. However, in light of Brugna's part-time status and the brevity of his time at Insight, the issue is not free from doubt.[13]

---

[13]    Before Brugna's hiring, Defendants transferred physician's assistants from Pinnacle to Insight, the significance of which is discussed later in this section. In addition, Defendants hired physician's assistants from a temporary employment agency. (Tr. 244). Plaintiff argues that the Court may consider the contract employees in ascertaining whether Insight met the statutory threshold (Pl. Opp. 7), but such a conclusion is not at all clear. Under the NYCHRL, "natural persons employed as independent contractors to carry out work in furtherance of an employer's business enterprise who are not themselves employers shall be counted as persons in the employ of such employer." N.Y.C. Admin. Code § 8-102(5); *see generally Fowler* v. *Scores Holding Co.*, 677 F. Supp. 2d 673, 680 (S.D.N.Y. 2009). However, at least one court has found persons employed by a temporary agency not to qualify as "persons" under this definition. *O'Neill* v. *Atlantic Sec. Guards, Inc.*, 671 N.Y.S.2d 976, 976 (1st Dep't 1998) (excluding independent contractors who are employed by corporations).

33

According to Plaintiff, Defendants Al and Steve Okhravi should also be included as employees because of their managerial and/or supervisory responsibilities at Insight. (Pl. Opp. 8). This contention, however, overlooks the legal framework outlined above. Analyzing the issue under either the *Clackamas* or the *Johnson & Higgins* factors, Dr. Steve Okhravi would appear to have too much control and seniority to count as an employee. *Cf. Drescher* v. *Shatkin*, 280 F.3d 201, 204 (2d Cir. 2002) (holding that president, who was the sole director and sole shareholder of corporation, and who dominated affairs of business to such an extent as to be "in control of the very policies and actions of which [employees] would be complaining," was not an "employee" for purposes of determining Title VII applicability). The status of Al Okhravi is a closer call: Using the *Johnson & Higgins* factors, Al Okhravi undertook traditional employee duties; worked for Insight (and Pinnacle); and reported to someone higher in the hierarchy (his brother, Steve), all of which counsel in favor of finding him to be an employee of Insight. (*See* Tr. 509-14). Using the *Clackamas* factors, Al Okhravi reported to his brother, but was otherwise very senior in the Insight organization; he was able to influence the organization; and he received a share of the profits (rather than a straight salary) from Insight, all of which counsel against finding him to be an employee of Insight. (Tr. 574-75).

Counting noses at Insight thus results in three definitely-qualifying employees, one highly-likely-to-be-qualifying employee, and one perhaps-

34

qualifying employee.  That, however, is not the end of the inquiry.  On the facts

of this case, Plaintiff is permitted to consider Pinnacle employees.  Using a joint

employer analysis, Plaintiff was permitted to consider Stefanie Messina, who

was jointly employed by both Pinnacle and Insight.  Messina's status as a joint

employee was confirmed by testimony of Steve Okhravi, who "delegate[d]

responsibilities for both Pinnacle and Insight" to her (Tr. 452), and by Plaintiff,

who testified to the frequency of their communications concerning

management of the Manhattan and Bronx medical offices (Tr. 77-79).  Notably,

Messina was the employee who reached out to Gina Whyte to arrange for the

latter's interview for the position of office manager at Insight (Tr. 331-33);

Messina signed the offer letter to Whyte on behalf of Insight as its "Practice

Administrator" (DX E); and Messina related to Plaintiff that her employment at

Insight had been terminated (Tr. 349-50, 435-36).

More fundamentally, the evidence at trial made clear that Insight and

Pinnacle were jointly run as a single integrated employer, thereby satisfying

even the higher, 15-employee threshold of Title VII.  (*See* Tr. 572-73 (testimony

of Al Okhravi that, in 2012, Pinnacle had 10-12 full-time employees, and with

part-time employees had 14-15 employees)).  While the corporate formalities

between the organizations were respected when it proved beneficial (such as,

for example, the filing of separate tax returns, *see* Tr. 444-45), in practice the

formalities were often ignored.  Al Okhravi performed substantively identical

managerial duties for Pinnacle and Insight, and worked for both companies "on

35

a regular basis." (Tr. 574). Indeed, Okhravi acknowledged that "if it is not against the law and illegal," he would perform his duties for both companies at the same time. (Tr. 577). It is neither, but it is a basis on which to find integration of operations. Stefanie Messina also performed duties for both companies, as detailed above. And Plaintiff testified to providing periodic assistance to Pinnacle, for which she was not separately compensated by Pinnacle. (Tr. 60-61). Plaintiff was given email addresses for both entities, and was permitted to access Insight patient records at either location. (Tr. 83).

Additional to the symbiotic managerial relationship between and among Al Okhravi, Plaintiff, and Messina was the fact that Insight and Pinnacle shifted personnel and supplies between them as needed. The employees included both administrative personnel, such as Erica Gonzalez, as well as Insight's and Pinnacle's physician's assistants, whose presence was necessary for patients to be seen at the respective offices. (Tr. 63-64). Plaintiff testified, though Defendants disputed, that Insight employees who worked at Pinnacle were paid for such work by Insight, and that Pinnacle employees who worked at Insight were not separately paid by Insight, because "[she] was the one that was in charge of getting the paychecks at Insight." (Tr. 64). Plaintiff also testified, and Defendants did not dispute, that supplies such as vaccines and suture kits were transferred between the parties as needed. (Tr. 61-62; *see*

36

*also* Tr. 453-54 (testimony of Dr. Okhravi acknowledging that he "move[d] resources from one entity to the other")).[14]

The circumstances of the termination of Plaintiff's employment are likewise illustrative of the integrated operation of the two entities. After receiving messages from Plaintiff on the morning of December 19, 2012, Al and Steve Okhravi met to discuss Plaintiff's continued employment at Insight; the meetings took place at Pinnacle's offices in midtown Manhattan. There, joined by Stefanie Messina, they interviewed Gina Whyte for a position at Insight; Messina, the nominal office manager of Pinnacle, had reached out to Whyte at Steve Okhravi's direction to gauge her interest in the position. Subsequently, after exchanging text messages with Plaintiff on December 22, 2012, Steve Okhravi ultimately directed Messina, at Pinnacle, to advise Plaintiff of the termination of her employment. (Tr. 435-36, 451-52).

In sum, for a variety of reasons, Defendants cannot credibly challenge that Insight had four or more employees during the relevant time period. That is sufficient to sustain the jury's award; after all, the jury awarded compensatory damages for the retaliatory conduct to which it found Plaintiff had been subjected. Such conduct necessarily qualified under the NYCHRL, which is construed more broadly than Title VII and has a lower threshold number of persons/employees. That said, aggregation of Pinnacle and Insight

---

[14]     And while this fact is more illuminative than dispositive of the issue, Al Okhravi testified that employees from both companies were invited to Pinnacle's holiday party. (Tr. 580-81).

employees under a single integrated employer theory is also warranted on these facts, and this would allow Plaintiff to satisfy even the higher employee-numerosity requirement of Title VII.

> ### d. Defendants' Other Defaulted Claims for Judgment as a Matter of Law Fail on the Merits

In their post-trial motions, Defendants raise other challenges to the jury's verdict that were not raised at trial, and that therefore are not properly brought under Fed. R. Civ. P. 50(b). These challenges include claims that (i) Plaintiff failed to prove that she engaged in protected activity, because she did not have a "good faith, reasonable belief" in her claims of sexual harassment; (ii) Plaintiff did not have an employment relationship with Insight at the time of the alleged retaliatory conduct; and (iii) Plaintiff failed to rebut Defendants' proffered non-discriminatory reason for her termination (or, conversely, failed to present sufficient evidence of a causal connection between her termination and "motives of retaliation or discrimination"). (Def. Br. 17). Separate and apart from the aforementioned fatal procedural defects, the claims also fail on the merits.

These precise claims were made, and rejected, by the jury at trial. Plaintiff claimed at trial that while there were staffing problems involving Fisher and Gonzalez, the real problem with her employment at Insight was that she was the recipient of numerous unwanted advances from Al Okhravi. Furthermore, while Plaintiff did discuss the possibility of leaving Insight to take a competing job offer on December 19, 2012, she never resigned, and made

clear to Al and Steve Okhravi shortly thereafter that she would remain at Insight because of her concerns for its patients.  Plaintiff argued, therefore, that the only reason for her termination on December 22, 2012, was the fact that she had complained to Dr. Steve Okhravi about Al Okhravi's behavior less than one hour earlier.  Defendants responded that Plaintiff and Al Okhravi had fought over a staffing issue, and that Plaintiff's perception that Okhravi had failed to appreciate her or her contributions caused her to fabricate a competing employment offer, to threaten to leave, and — upon learning of the hiring of Gina Whyte — to level a false accusation of sexual harassment. Particularly given the dearth of corroborating text messages, both sides were able to make their arguments.  The Court cannot say that the jury's ultimate decision was untethered to the evidence.

A retaliation claim under Title VII requires proof of (i) conduct by the plaintiff that is protected activity under Title VII; (ii) of which the employer was aware; (iii) followed by an adverse employment action of a nature that would deter a reasonable employee from making or supporting a discrimination claim; (iv) that was causally connected to the protected activity.  *See Kessler* v. *Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006) (collecting cases).  "Protected activity" in this context includes an employee's complaint to supervisors about alleged unlawful activity that turns out not to be unlawful, so long as the employee "had a good faith, reasonable belief that [s]he was opposing an employment practice made unlawful by Title VII."

39

*McMenemy* v. *City of Rochester*, 241 F.3d 279, 285 (2d Cir. 2001) (citation

omitted).  Retaliation claims under the NYCHRL are even more broadly defined:

> It shall be an unlawful discriminatory practice for any
> person engaged in any activity to which this chapter
> applies *to retaliate or discriminate in any manner against
> any person because such person has (i) opposed any
> practice forbidden under this chapter....* The retaliation
> or discrimination complained of under this subdivision
> need not result in an ultimate action with respect to
> employment, housing or a public accommodation or in
> a materially adverse change in the terms and conditions
> of employment, housing, or a public accommodation,
> *provided, however, that the retaliatory or discriminatory
> act or acts complained of must be reasonably likely to
> deter a person from engaging in protected activity.*

N.Y.C. Admin. Code § 8-107(7) (emphases added).

Defendants' first argument — that Plaintiff lacked a "good faith,

reasonable belief" that her complaint to Dr. Steve Okhravi amounted to

protected conduct — stems from Defendants' claim that Plaintiff fabricated her

sexual harassment claim.  That argument was specifically rejected by the jury,

and the evidence at trial supported the jury's decision.  By the time of trial,

Plaintiff lacked any contemporaneous evidence of any untoward conduct by Al

Okhravi; however, she testified at length concerning this conduct at trial, and

her testimony — which was not implausible on its face or in relation to the

documentary evidence at trial — was necessarily credited by the jury to some

degree in reaching its verdict.  That testimony, coupled with the December 22,

2012 text from Plaintiff to Dr. Okhravi that was introduced at trial, showed

Plaintiff explaining to Dr. Okhravi that she had reacted in a certain way

specifically because of her discomfort with Al Okhravi's repeated requests for a

40

sexual relationship.  Her complaint to Dr. Okhravi qualifies as protected activity.

Defendants' second challenge fail for analogous reasons.  Defendants argued at trial that Plaintiff had already resigned from Insight on December 19, 2012; that any time she spent thereafter at Insight was akin to her giving "two weeks' notice"; and that asking her not to return to the office on December 22, 2012, did not therefore amount to a termination.  This, too, was rejected by the jury, and evidence at trial supports the jury's verdict.  While Stefanie Messina espoused this resignation argument, she acknowledged that by December 20, 2012, she believed that Plaintiff intended to accept Al Okhravi's request that she reconsider.  (Tr. 344).  Dr. Steve Okhravi also claimed that Plaintiff had resigned, but fumbled somewhat in explaining why he had scheduled a meeting with Plaintiff to discuss her concerns and then canceled it (and Plaintiff's employment) some 30 minutes later.  (Tr. 480-84 (claiming that the meeting was canceled because Plaintiff did not send him the text messages within that 30-minute period)).  In contrast, Plaintiff testified, in testimony that was credited by the jury, that while she discussed the (fabricated) job offer with Al Okhravi, she "never told him [she] was going to leave."  (Tr. 173; *see also* Tr. 177 ("I wanted to stay working at the office. I just wanted everything else that was going on with the sexual harassment to stop.")).

Plaintiff's testimony was corroborated by text messages post-dating
December 19, where Plaintiff indicates her intention to remain at Insight.  As
but a few examples:

- In a text message sent at 6:44 p.m. on December 20, 2012,
Plaintiff specifically advised Al Okhravi (and forwarded the
same message to Dr. Steve Okhravi on December 22, 2012)
that "regardless of our little difference[s,] my feelings
toward the office or the [patients] are the same.  I would
never aba[n]don them at this moment, I would never walk
out and leave them hanging.... This is not the time for me
to leave.... [Trust] me[, I] will not leave [you] at a time like
this." (*See also* Tr. 178 (testimony of Plaintiff that this
message was sent "[b]ecause I wanted to clarify to him that
I was not going to leave the office in the situation that it
was, that I was going to stay at the office working")).

- Earlier on December 20, Plaintiff had exchanged texts with
Stefanie Messina, noting that "he" (presumably Al Okhravi)
was interviewing individuals to assist Plaintiff at Insight,
for which she expressed relief because "[she] need[ed] the
help."  Messina responded at 4:08 p.m. that this news was
"good," because it meant that Plaintiff was staying on at
Insight. In texts sent at 4:09 and 4:10 p.m., Plaintiff
complained about Al Okhravi's treatment of her earlier in
the day, but confirmed that she would "stay here at my job
and [would] work whatever way he wants to work."

- In a text message sent at 10:27 a.m. on December 22, 2012
(i.e., after Plaintiff had sent the text concerning Al
Okhravi's sexual advances), Plaintiff advised Dr. Steve
Okhravi that, while she was upset at his lack of support,
she would refrain from discussing those issues and wanted
to "only talk about work related issues during my work
schedule." A few minutes later, at 10:41 a.m., responding
to Dr. Okhravi's suggestion that they meet in the next
week, Plaintiff agreed, and indicated that she would see
him the following Monday.

By contrast, there are no texts referencing Plaintiff's resignation.  While there

was testimony of a conversation with Messina in which a resignation was

communicated, the jury was entitled to discredit that testimony, especially given Plaintiff's testimony that she would only have communicated her resignation to Al Okhravi.  (Tr. 190).

Defendants' final challenge concerns the evidence of a causal connection between Plaintiff's complaint to Dr. Steve Okhravi and her termination.  To be sure, the evidence indicates that Gina Whyte was hired on December 19, 2012, to work at Insight.  However, the parties introduced neither testimonial nor documentary evidence that anyone advised Plaintiff that her replacement (as opposed to her assistant) had been hired.  To the contrary, as just noted, Messina expressed excitement on December 20, 2012, that Plaintiff had elected to stay at Insight.  The jury learned that within an hour of Plaintiff complaining to Dr. Steve Okhravi that she had been subject to sexual harassment at the hands of his brother, she was asked not to return to work.  On the facts of this case, the jury was permitted to infer a causal connection from the deficiencies in Defendants' explanation for the termination (such as Dr. Okhravi's reference to Plaintiff's failure to provide him the texts immediately, when his texts included no such directive), as well as the temporal proximity of the two events. *Cf. Gorman-Bakos* v. *Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) ("a plaintiff can indirectly establish a causal connection to support a ... retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action" (citation and

43

internal quotation marks omitted) (alteration in *Gorman-Bakos*); *accord Summa* v. *Hofstra Univ.*, 708 F.3d 115, 127-28 (2d Cir. 2013).

For all of these reasons, and finding ample support for the jury's verdict of retaliation, the Court denies Defendants' motion for judgment as a matter of law.

## B. Defendants Are Not Entitled to a New Trial or to Remittitur of the Damages Award

### 1. Applicable Law

As a fallback position, Defendants move for a new trial or a remittitur of the damages award. (Def. Br. 18-21). Under Rule 59(a), a court "may, on motion, grant a new trial on all or some of the issues ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The standard for granting a new trial under Rule 59(a) is less stringent than the standard for judgment as a matter of law under Rule 50. *See, e.g.*, *Manley* v. *AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003). That said, the Second Circuit has held that a grant of a new trial is appropriate under this rule only where "the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Piroscafo* v. *Metro-North Commuter R.R. Co.*, 552 F. App'x 6, 9 (2d Cir. 2013) (summary order) (quoting *Lightfoot* v. *Union Carbide Corp.*, 110 F.3d 898, 911 (2d Cir. 1997)). Moreover, the Court has made clear that

> Our precedent is clear that a "decision is against the weight of the evidence if and only if the verdict is

44

[i] seriously erroneous or [ii] a miscarriage of justice." Our cases teach that a high degree of deference is accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency. Unlike on a Rule 50 motion, however, on a Rule 59 motion the court "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." But when, as here, "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice."

*ING Global*, 757 F.3d at 99 (quoting *Raedle* v. *Credit Agricole Indosuez*, 670 F.3d 411, 417-18, 419 (2d Cir. 2012)); *see also Raedle*, 670 F.3d at 418 (noting that a district court judge "must exercise their ability to weigh credibility with caution and great restraint," and may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury" (quoting *DLC Mgmt. Corp.* v. *Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998), and *United States* v. *Landau*, 155 F.3d 93, 104 (2d Cir. 1998))).

Courts may agree with a jury's findings of fact, but disagree with its damages award. "If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Lee* v. *Edwards*, 101 F.3d 805, 808 (1996) (quoting *Tingley Sys. Inc.* v. *Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir.

45

1995)); *see generally Gasperini* v. *Ctr. for Humanities, Inc.*, 518 U.S. 415, 433 (1996); *Lore*, 670 F.3d at 153.

"Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Lin* v. *McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir. 1984); *see also Psihoyos* v. *John Wiley & Sons, Inc.*, No. 11 Civ. 1416 (JPO), 2012 WL 5506121, at *1-2 (S.D.N.Y. Nov. 7, 2012). The Second Circuit has identified "two distinct kinds of cases" in which conditional remittitur is appropriate: (i) when the court discerns "an error that caused the jury to include in the verdict a quantifiable amount that should be stricken" or (ii) when the award is "intrinsically excessive" in the sense that no reasonable jury could have awarded the amount, whether or not the excessiveness can be attributed to "a particular, quantifiable error." *Kirsch* v. *Fleet St. Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quoting *Trademark Research Corp.* v. *Maxwell Online, Inc.*, 995 F.2d 326, 337 (2d Cir. 1993)). Where there is no discernible error, the jury's verdict should be set aside as "intrinsically excessive" only if "the award is so high as to shock the judicial conscience and constitute a denial of justice." *Id.* (quoting *O'Neill* v. *Krzeminski*, 839 F.2d 9, 13 (2d Cir. 1988)) (internal quotation marks omitted).

### 2.   Discussion

Turning first to the jury's verdict, the Court cannot say that it was the product of evidentiary or other trial-conduct errors, or that it is against the weight of the evidence. Both sides presented arguments that sought to

46

reconcile the evidence that existed at the time of trial; that the jury accepted Plaintiff's explanation over Defendants' is supportable on the trial record, for reasons similar the those outlined by the Court in denying the Rule 50(b) motion.

With respect to the remittitur issue, the parties have not identified, and the Court has not found, any error in the jury instructions that would have caused the jury to include an amount that should be stricken; in consequence, the Court's inquiry is limited to a review of whether the award "shock[s] the judicial conscience." *Kirsch*, 148 F.3d at 165.  It does not.  Defendants do not appear to dispute Plaintiff's claims of $6,971.50 in lost wages and $4,000 in reduced wages.  (*See* Def. Br. 20; Def. Reply 9; *see also* Tr. 686 (Plaintiff's counsel seeking $13,000 in lost wages at trial)).  Instead they argue that the remaining $39,000 in damages is unsubstantiated.  Notably, however, Plaintiff introduced considerable evidence (in the form of testimony from herself and social worker Jensy Linares) concerning the mental anguish she had experienced as a result of both her wrongful termination and what she perceived (sincerely but inaccurately, according to the jury's verdict) to be a hostile work environment.

While Plaintiff felt disgusted and degraded by her fall 2012 interactions with Al Okhravi (Tr. 87, 176, 218), she was consistently able to perform her job functions (Tr. 269, 301-02).  It was only after her termination that Plaintiff — a single mother who had been summarily dismissed a few days before Christmas,

and mere minutes after complaining to her boss about the conduct of his brother — began to suffer panic attacks, depression, and difficulty sleeping. (Tr. 213-18).  Indeed, her symptoms progressed to such a degree that her primary care physician referred her to Linares, who observed Plaintiff as "nervous, anxious, unable to concentrate, unable to sleep" and diagnosed her with post-traumatic stress disorder and depressive disorder.  (Tr. 134-38). Plaintiff continues to take medication for her anxiety.  (Tr. 214-15).  Given this record, the Court will not disturb the jury's award.

## C.   Defendants Are Not Entitled to Fees and Costs

Finally, Defendants' motion for the award of fees and costs as "partially prevailing" parties, can be swiftly rejected.  In fee-shifting statutes such as Title VII, "a prevailing plaintiff ordinarily is to be awarded attorney's fees in all but special circumstances," *Christiansburg Garment Co.* v. *EEOC*, 434 U.S. 412, 417 (1978), while a district court has the discretion to award attorney's fees to a prevailing defendant *only* "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not [necessarily] brought in subjective bad faith," *id.* at 421.  *See also id.* at 421-22 (cautioning courts against "engag[ing] in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation").  In situations where a "plaintiff assert[s] both frivolous and non-frivolous claims," the court may grant to a defendant only those fees

"that the defendant would not have incurred but for the frivolous claims." *Fox* v. *Vice*, 131 S. Ct. 2205, 2211 (2011).

The Court cannot say, as did the Second Circuit in *Carter* v. *Inc. Village of Ocean Beach*, 759 F.3d 159, 164 (2d Cir. 2014), that Plaintiff's claims were "not the stuff of litigation."  Plaintiff's retaliation claim succeeded at trial and will not be disturbed by this Court.  And while Plaintiff's hostile work environment claim was not ultimately successful, a careful review of the evidence detailed in the Facts section of this Opinion confirms that the claim was not baseless.  Accordingly, the motion is denied.

## CONCLUSION

For the reasons set forth above, Defendants' Post-Trial Motions and Motion for Fees and Costs are DENIED.  The Clerk of Court is directed to terminate the motions pending at docket entries 65 and 67.

The parties are further ORDERED to file a joint submission on or before **January 5, 2015**, proposing a briefing schedule for Plaintiff's contemplated motion for attorneys' fees and costs pursuant to 42 U.S.C. § 2000e–5(k) and/or N.Y.C. Admin. Code § 8-502(f).

SO ORDERED.

Dated:     December 22, 2014
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

49